**Malinda HEERWAGEN, individually and on behalf of a class of similarly situated individuals, Plaintiff–Appellant,**

v.

**CLEAR CHANNEL COMMUNICATIONS, Clear Channel Entertainment, Inc., Clear Channel Radio, Inc., and Clear Channel Broadcasting, Inc., Defendants–Appellees.**

No. 04–0699–CV.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 2004.

Decided Jan. 10, 2006.

220

Lee Squitieri, New York, New York (Maria J. Ciccia, Squitieri & Fearon, LLP, New York, New York; Kenneth A. Wexler, Jennifer Fountain Connolly, The Wexler Firm, LLP, Chicago, Illinois, of counsel), for Plaintiff–Appellant.

Jonathan M. Jacobson, Wilson Sonsini Goodrich & Rosati, New York, New York (Charles E. Biggio, Wilson Sonsini Goodrich & Rosati, New York, New York; Abid Qureshi, Jamie L. Berger, Akin Gump Strauss Hauer & Feld LLP, New York, New York; Dale A. Head, Richard A. Munisteri, Clear Channel Entertainment, Houston, Texas, of counsel), for Defendants–Appellees.

Before: CARDAMONE, McLAUGHLIN, and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge.

Plaintiff, a putative class representative, brought this civil antitrust action in the United States District Court for the Southern District of New York (Sprizzo, J.), charging violations of § 2 of the Sherman Act against defendants Clear Channel Communications, Inc., *et al.* Plaintiff initiated suit on June 13, 2002 seeking damages and injunctive relief. She amended her complaint two months later. Defendants moved unsuccessfully to dismiss the amended complaint. Plaintiff then filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3). After limited discovery, the district court denied that motion in an order dated August 11, 2003.

## BACKGROUND

### I The Parties

Plaintiff Malinda Heerwagen (Heerwagen, plaintiff or appellant), an Illinois resident, has lived in Chicago during the entire putative class period from 1997 to the present. During that time she attended ten rock concerts held in her hometown where she heard, among others, U–2, The Grateful Dead, The Rolling Stones, and Paul McCartney. Heerwagen has not attended any concerts outside Chicago during the class period, nor has she studied the ticket prices of concerts held elsewhere.

Defendants Clear Channel Radio, Inc. and Clear Channel Entertainment, Inc. are

wholly owned subsidiaries of defendant Clear Channel Communications, Inc. (collectively, Clear Channel, defendant, or company), which is based in Texas. Defendant, together with its subsidiaries, makes up a media empire which owns, programs, and sells air time for nearly 1,200 U.S. radio stations and has interests in 240 radio stations overseas. Through its subsidiaries defendant promotes or produces more than 26,000 live entertainment events per year; owns more than 135 live entertainment venues; and controls 900 music-related websites, 19 television stations, and more than 700,000 outdoor-advertising displays.

## II Plaintiff's Allegations

### A. *Live Concert Industry in General*

The following facts regarding the live concert ticket industry are alleged in the complaint. Typically, a live concert is the product of negotiations between a concert promoter, who stages a performance, and a booking agent, who represents an artist. The agent sells the right to organize a particular concert to a promoter who not only oversees the logistics and sells tickets to the public, but is ordinarily also responsible for the expenses of a show he promotes.

In the early 1970s, as new artists emerged whose performances could fill larger venues, certain regional promotion companies became big businesses. In 1997 a company called SFX Enterprises, Inc.(SFX) spent billions to acquire many major regional promoters. In 2000 Clear Channel purchased SFX and thereby became the nation's largest promoter and producer of live entertainment events. In 2001 defendant accounted for 70 percent of concert ticket revenue in the United States. Clear Channel's combined ownership of radio stations, outdoor advertising, and concert halls enabled it to book nation-wide tours for performing artists without the involvement of independent operators, which regional promoters by definition cannot accomplish.

### B. *Allegations of Monopolistic Practices*

Plaintiff maintains that Clear Channel uses its national presence to set nationally uniform concert ticket prices for certain tours. Specifically, plaintiff's amended complaint charges that Clear Channel has engaged in anticompetitive, predatory, and exclusionary practices in an effort to acquire, maintain and extend its monopoly power in a national ticket market for live rock concerts. Defendant's conduct allegedly constituted monopolizing and attempted monopolizing of the relevant market and thus violated § 2 of the Sherman Act, 15 U.S.C. § 2. This conduct allegedly injured plaintiff because it forced her to pay inflated prices for concert tickets. The amended complaint also asserts an unjust enrichment claim that the parties do not pursue on this appeal.

To prove an unlawful inflation of ticket prices plaintiff relies on the difference between recent increases in concert ticket prices nationwide and recent increases in the Consumer Price Index (CPI). According to Princeton University Economics Professor Alan B. Krueger, U.S. concert ticket prices rose 61 percent from 1997 to 2002, but only 21 percent between 1991 and 1996. *See* Alan B. Krueger, *How Much is Too Much? The Economics of Concert Ticket Prices*, Keynote Address at the Concert Industry Consortium 2002 (Feb. 7, 2002), *in* The Concert Hotwire, Mar. 4, 2002, at 16, 17 (exhibit to motion for class certification). By comparison, the CPI increased 13 percent between 1997 and 2002, and 15 percent between 1991 and 1996. *Id.* Prices for top groups (those listed in the *Rolling Stone Encyclopedia of Rock and Roll* for which Pro-

fessor Krueger had data) rose even more; ticket prices for these groups rose 73 percent between 1997 and 2002. *Id.* In that period the price of concert tickets rose more than ticket prices for movies, theatrical performances and sporting events. *Id.* at 20.

Plaintiff asserts that the rise in concert ticket prices during the proposed class period, 1997 to the present, was the direct result of Clear Channel's intentional use of its dominance in other markets, particularly in the radio market, to achieve its objective of monopolistic profits through higher ticket prices. Heerwagen avers that Clear Channel has excluded competitors from the relevant market by using its position in the radio industry to put pressure on artists who do not avail themselves of Clear Channel's concert promotion services (non-Clear Channel artists) in a number of ways: (a) limiting their access to advertising on Clear Channel radio stations; (b) misrepresenting the availability of advertising; (c) charging them excessive advertising rates; (d) excluding them from updates on future concert dates; and (e) failing to include them in miscellaneous promotions such as ticket giveaway contests.

By these means, plaintiff maintains, the company has been able to lure artists to sign on with it as a promoter of their tours. According to the complaint, Clear Channel's alleged anticompetitive actions have led to reduced competition in the concert promotion market, unreasonable restraint of competitors' entry into the relevant market, limitation of air time for non-Clear Channel artists, and reduction of announcements about non-Clear Channel artists' upcoming concerts. These alleged unreasonable restraints have resulted in artificially high concert ticket prices and a decrease in concert information available to consumers. Plaintiff insists that any procompetitive benefits of defendant's actions are outweighed by these anticompetitive effects.

## III District Court Proceedings

Plaintiff's amended class action complaint defined the putative class as follows

All persons (excluding defendants, their respective parents, subsidiaries and affiliates and any judge or magistrate presiding over this action and members of their families within the third degree of relationship) who purchased tickets to any live rock concert in the United States directly from any of the defendants or their affiliates or predecessors or agents during the period January 1, 1997 through the present.

After defendant moved to dismiss plaintiff's amended complaint the district court ordered minimal discovery held on the class certification issue. It included two experts' reports and depositions, plaintiff's deposition, public concert ticket pricing data, and information from publicly available sources with regard to the concert promotion business. The district court observed that resolution of the class action motion boiled down to one pivotal question: whether the relevant market for assessment of plaintiff's § 2 claim was national, thus justifying a national class. It also properly observed that beyond this pivotal question, the plaintiff had to show she was an adequate and typical representative and that a class action was the preferred method for resolving this controversy.

After discovery was completed, the district court held a three day evidentiary hearing on the class certification motion at which it heard testimony from Dr. Arthur Gruen, Jr., plaintiff's expert witness, and Professor Richard Gilbert, Clear Channel's expert witness. At the close of the hearing, the district court ruled that the relevant market was local. During the certifi-

cation hearing the district judge found, in addition, that Clear Channel did not have the power to control prices and exclude competition nationally. Had it such power, the district court observed, there would be no price variations for concert ticket prices around the country, but defendant's expert had demonstrated that there was such variation. As a consequence of these rulings, the class certification petition was denied.

Under Federal Rule of Civil Procedure 23(f), Heerwagen filed a petition in this Court for permission to appeal the district court's August 11, 2003 denial of her class certification motion. A panel of this Court granted the petition in an order dated February 11, 2004. This appeal followed.

## DISCUSSION

### I Standard of Review

■■■ In reviewing a district court's decision regarding a motion to certify a class, we generally apply the deferential abuse of discretion standard. *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 132 (2d Cir.2001). When reviewing a denial of class certification, we accord the district court noticeably less deference than when we review a grant of certification. *Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 18 (2d Cir.2003). We will find an abuse of discretion whenever the district court commits an error of law, which we review *de novo,* makes clearly erroneous findings of fact, or renders a decision outside "the range of permissible decisions." *Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 169 (2d Cir.2001).

### II Class Certification Requirements

■■ Federal Rule of Civil Procedure 23(a) ensures that a plaintiff who seeks to be a class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *See Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In assessing whether a given action meets the Rule 23(a) requirements, a district court should not evaluate the merits of the underlying claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rather, it should conduct a rigorous analysis to determine whether the elements of Rule 23 have been satisfied. *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364. The requirements of Rule 23(a) for certifying a class are

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see Marisol A. v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997).

A district court deciding whether class certification is appropriate must ascertain not only whether plaintiff's case meets the preconditions of Rule 23(a), but also whether it falls into one of the categories found in Rule 23(b). *Marisol A.,* 126 F.3d at 376. Heerwagen moved to certify her proposed class pursuant to Rule 23(b)(3), which states that a class action may be maintained where

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of

the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Rule 23(b)(3) tests whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). To meet the predominance requirement of Rule 23(b)(3)—*i.e.,* that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," Fed. R.Civ.P. 23—a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof. *See In re Visa Check,* 280 F.3d at 136.

In its order denying plaintiff's motion for class certification, the district court concluded "that plaintiff is … not an adequate or typical representative of a class of ticket purchasers beyond those in plaintiff's local market, and that there are not questions of law and fact common to all class members, *see* Fed. R. Civ. Proc. 23(b)(3)." In light of the district court's citation of Rule 23(b)(3), we read its order as a finding that plaintiff did not meet the predominance requirement of Rule 23(b)(3). To the extent that the district court was correct that plaintiff has not satisfied Rule 23(b), and we hold below that it was, whether plaintiff met the prerequisites of Rule 23(a) would not be determinative of her ability to maintain a class action. Therefore, we need not address the Rule 23(a) factors here even though the district court's order may also be read as determining that plaintiff had not demonstrated commonality, typicality, or adequacy of representation.

## III Plaintiff's Claims on Appeal

Heerwagen claims that defendant was guilty of monopolization and attempted monopolization in violation of § 2 of the Sherman Act, which provides in pertinent part: "[e]very person who shall monopolize, or attempt to monopolize, … any part of the trade or commerce among the several States[ ] … shall be deemed guilty of a felony." 15 U.S.C. § 2. A violator of § 2 may be held civilly liable to any party suffering "injury in his business or property." 15 U.S.C. § 15.

To establish a claim for monopolization, plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (per curiam) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Monopoly power is "the power to control prices or exclude competition," *id.* at 107 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)), and is also referred to as a high degree of "market power," *see Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 97 (2d Cir.1998). To succeed on her claim, plaintiff must show that defendant has "engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding

competition, thus creating or maintaining market power." *PepsiCo,* 315 F.3d at 108.

To recover for attempted monopolization, plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Because our analysis applies with equal force to plaintiff's claim for attempted monopolization, we need not treat that claim separately.

On appeal, plaintiff contends that the trial court erred in: (1) assuming she must prove her monopolization claim in the context of a specific market; (2) considering the relevant market to be local, because Clear Channel engaged in a national course of conduct; and (3) making certain purported procedural errors including limiting discovery and considering the merits of her claim by impermissibly weighing the testimony of expert witnesses. We address each of these contentions in turn.

### A. *Proof of Monopolization in a Specific Market*

Monopoly power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Tops Mkts.,* 142 F.3d at 98; *PepsiCo,* 315 F.3d at 107. Indirect proof of market power, that is, proof that the defendant has a large percentage share of the relevant market, is a "surrogate" for direct proof of market power. *See* 2A Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (Areeda & Hovenkamp) ¶ 531a, at 187 (2d ed.2002). Courts often rely on indirect proof of market power because direct mea-

sures are often difficult or impossible to prove. *See id.* ¶ 515, at 114 (explaining that "[i]n resolving market or 'monopoly' power issues, the courts have typically relied heavily on market definition and on the defendant firm's share of the market thus defined").

The relevant market consists of a relevant product market and a relevant geographic market. *See PepsiCo,* 315 F.3d at 105; *United States v. Eastman Kodak Co.,* 63 F.3d 95, 104 (2d Cir.1995). Because we affirm the district court's judgment that denied certification due to plaintiff's failure to show that the live rock concert ticket market was national, we need not address the issue of whether the rock concert ticket market is a single product market. Plaintiff's case fails regardless of whether or not she can make such a showing with respect to the product market issue.

Courts generally measure a market's geographic scope, the "area of effective competition," by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Eastman Kodak Co.,* 63 F.3d at 104. This approach evaluates the geographic aspect of the elasticity of a specified market—that is, how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location. *See AD/SAT v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999) (discussing elasticities of demand and supply in the context of the relevant product market).

■■■■ In other words, "[t]he geographic market encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994); *see also* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* (Hovenkamp) § 3.6, at 113 (2d ed. 1999) ("The relevant geographic market for antitrust purposes is some geographic area in which a firm can increase its price without 1) large numbers of its customers quickly turning to alternative supply sources outside the area; or 2) producers outside the area quickly flooding the area with substitute products."). Factors relevant to the geographic scope of a market may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location or start-up costs in that location, as well as the relative preferences of consumers with respect to travel and price. *See* Areeda & Hovenkamp, ¶ 550, at 247, ¶ 556, at 291.

The relevant geographic market for goods sold nationwide is often the entire United States, though it need not be if purchasers cannot practicably turn to areas outside their own area for supply of the relevant product. *See Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). In certain service industries, the geographic market may be confined by the fact that it can be impractical for consumers to travel great distances to procure particular services. For example, historically, the geographic market for banking services is localized due to the local nature of the demand for such services. *See United States v. Conn. Nat'l Bank*, 418 U.S. 656, 667–68, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974). Start-up or transportation costs may prohibit new entrants from readily

competing within an area even in response to increased prices. Accordingly, courts have held that the market for certain entertainment services—such as, for example, tickets to movie theater showings—is local or regional. *See Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1248 (9th Cir.1990) (considering the relevant market for motion pictures to be the greater metropolitan area); *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230 & n. 10 (3d Cir.1988) (determining the movie ticket market based on how far theatergoers travel to see movies); *cf. Gemini Concerts, Inc. v. Triple–A Baseball Club Assocs.*, 664 F.Supp. 24, 26–27 (D.Me.1987) (reasoning that geographic area specified in non-compete agreement constituted the relevant market).

As Heerwagen's own testimony shows, there is little cross-elasticity of demand for live rock concert tickets between geographic areas. A purchaser of a concert ticket is hardly likely to look outside of her own area, even if the price for tickets has increased inside her region and decreased for the same tour in other places. Tours are promoted nationally, but a higher price in Boston will not lead Boston purchasers to buy tickets for the same concert held in New York—at least not according to the evidence adduced during the class certification hearing. Such evidence accords with common sense in the calculus for the availability of substitutes. The cost to attend a concert in a remote geographic region would be substantially greater than whatever increment a concert promoter might add to the cost of a concert ticket. Hence, from the standpoint of the individual concertgoer the two concert tickets are not substitutes for one another. Plaintiff's expert did not dispute this conclusion.

■■■■ Here, despite Heerwagen's argument that the relevant market for concert

tickets is national, the district court determined that it is local. The court concluded that Heerwagen could not therefore satisfy Rule 23(b)(3), because particular proof—specific to individual members of the putative class who reside in different geographic markets—would predominate. Heerwagen insists that this conclusion was erroneous, because she can prove her claims with direct evidence of market power that is not dependent on reference to a specific geographic market. She argues that "Clear Channel had 'market power' which obviated the need for plaintiff to delineate a geographic market and establish Clear Channel's market share."

■■■ Plaintiff's argument that she need not delineate a geographic market is one we cannot adopt. Instead, a plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market. *See Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir.2004) (explaining that a plaintiff could not escape reference to a specific market in a monopolization claim because, "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market"); *see also* Hovenkamp § 3.6, at 112 ("Someone who has market power does not generally have it everywhere.").

■■■ A showing of market power is a substantive element of plaintiff's monopolization claim, *see Spectrum Sports*, 506 U.S. at 456, 459, 113 S.Ct. 884, and plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition. As we have said in the context of a putative RICO and fraud class action, "a common course of conduct is not enough to show predominance, because a common course of conduct is not sufficient to establish liability of the defendant to any particular plaintiff." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir.2002).

Even if plaintiff attempts to prove her monopolization claims by direct evidence, she will have to rely on market specific evidence of Clear Channel's power in particular markets that will vary from one putative class member to another. *See Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir.2005) ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question."). In light of the substantial non-common issues regarding market power, and because we review the district court's factual determination as to the bounds of the relevant geographic market for clear error, *see United States v. Engelhard Corp.*, 126 F.3d 1302, 1305 (11th Cir.1997); *Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 889 F.2d 224, 232 (9th Cir.1989), it was not error for the district court to conclude that individualized questions would predominate.

### B. *Clear Channel's Alleged National Conduct Does Not Alone Render the Relevant Market National*

Heerwagen next contends that even if she must prove her monopolization claim with reference to a specific geographic market, she should nonetheless have prevailed on her motion for class certification because, she insists, the market for concert tickets at issue here is national. As noted, she does not urge that there is any significant degree of elasticity in the market for concert tickets across geographic locations, but rather objects to the district court's

determination that the relevant market is local on the ground that Clear Channel's national course of alleged anticompetitive conduct alone is sufficient to render the relevant market national. In connection with that argument, plaintiff observes that a Department of Justice memorandum described the "relevant market for concert tours as being 'national.'" But she neglects to mention that the memo does not refer to the market that is at issue here—the retail market for concert *tickets*. In any event, as the subject of the memo, "Request to Open Preliminary Investigation: Clear Channel Communications, Inc. and SFX Entertainment, Inc.," makes plain, the memo is hardly the product of any conclusive factfinding deserving of judicial deference.

In support of her position, plaintiff relies on *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In *Grinnell*, the Supreme Court affirmed a finding of a national market where a company that supplies fire and burglar alarm services operates nationally, engages in national planning, is a party to national agreements with competitors, has a "national schedule of prices, rates and terms, though the rates may be varied to meet local conditions," follows rate-making, inspection, and certification by national insurers, and makes nationwide contracts with customers. *Id.* at 575, 86 S.Ct. 1698. The Supreme Court ruled that the geographic market was national even though the company could sell its product only to customers within a 25–mile wide radius from each of its central station service centers. *See id.* at 575–76, 86 S.Ct. 1698. Because it is fair to assume the Supreme Court recognized that from an economic standpoint, the market for cen-

tral service protection was local, we read *Grinnell* to stand for the proposition that in some cases involving services that tend to be provided locally, the market for purposes of the antitrust laws still could be national.

Heerwagen argues that her case is similar to *Grinnell*. She contends that although Clear Channel provides a local product, in the sense that only those people in a particular region are likely to buy tickets to concerts in that region, the relevant market for analysis of its monopoly power should be national because Clear Channel operates and sets prices nationally. Clear Channel disputes the contention that it operates and sets prices nationally. Even assuming that Clear Channel conducts business and sets prices at a national level, *Grinnell* is plainly distinguishable from the case before us.

*Grinnell* involved the formation of nationwide procurement contracts, horizontal agreements between multistate competitors, and an interstate manufacturing business. *See id.* Here, by contrast, there are no claims that Clear Channel entered into any horizontal agreements, sold concert tickets pursuant to national contracts or marketed manufactured goods on a national basis. We decline to read *Grinnell* so broadly as to apply it here. The Supreme Court's method of determining relevant geographic markets generally reference both the "area in which the seller operates, *and* to which the purchaser can practicably turn for supplies," *Tampa Elec. Co.*, 365 U.S. at 327, 81 S.Ct. 623 (emphasis added); *Conn. Nat'l Bank*, 418 U.S. at 668, 94 S.Ct. 2788; *United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 362, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). Local markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally. Plain-

tiff's reliance on *Grinnell* is therefore misplaced, and that case does not lead us to conclude that the district court erred in determining that the relevant market was local rather than national.

### C. *Purported Procedural Errors*

Plaintiff maintains finally that in deciding her motion for class certification, the district court erred by considering the merits of her claims and limiting discovery. Upon a review of the record, we conclude that neither of the purported procedural errors of which plaintiff complains constitutes error, let alone an abuse of discretion.

### 1. Considering the Merits

Plaintiff argues that the district court impermissibly considered the merits of her claims by requiring her to make a predominance showing under Fed.R.Civ.P. 23(b)(3) by a preponderance of the evidence and by weighing the competing testimony of the experts on this issue.

The district court is not permitted to conduct a preliminary inquiry into the merits of plaintiff's case at the class certification stage. *See* 5 James Wm. Moore, *Moore's Federal Practice* § 23.84[2][b], at 23–343–44 (3d ed.2004); *In re Visa Check*, 280 F.3d at 135; *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir.1999). "[I]n making a certification decision, a judge must look somewhere 'between the pleading and the fruits of discovery.... Enough must be laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain.'" *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571–72 (2d Cir.1982). The Supreme Court's opinion in *Falcon* is not to the contrary; it simply noted that a certifying court may not be able to "come to rest" on the certification decision before

probing behind the pleadings, and thus class certification decisions may be modified as proceedings progress. *See Falcon*, 457 U.S. at 160, 102 S.Ct. 2364.

Judge Sprizzo did in fact make comments suggesting that he compared the relative weight of the experts' testimony. *See, e.g.*, Tr. of Aug. 6, 2003 Hr'g, at 192 (commenting to plaintiff's counsel that defense counsel "put on a witness who is much more persuasive than yours ...."); *id.* at 199 (asking rhetorically regarding the testimony of plaintiff's expert, "what weight does it have?"); *id.* at 197 (stating to plaintiff's counsel regarding the testimony of the experts: "I'm weighing the weight. That's where you're in trouble."). Even assuming these comments to amount to weighing the experts' testimony, we find no error.

In *Caridad*, we reviewed the denial of a class certification motion in a discrimination suit where the district court had determined that plaintiffs failed to show commonality and typicality under Rule 23(a) with respect to a challenge to defendant's policy of delegating to supervisors discretionary authority to make decisions concerning employees' discipline and promotion. *See Caridad*, 191 F.3d at 292. We believed the district court had permitted "statistical dueling" between the experts and that plaintiffs had made an adequate showing of commonality and typicality, *id.* at 292–93, and ruled that when "deciding a certification motion, district courts should not consider or resolve the merits of the claim of the purported class. Such a weighing of the evidence is not appropriate at this stage in the litigation." *Id.* at 293. Accordingly, by weighing expert testimony on the commonality and typicality questions, the trial court in *Caridad* erroneously conducted a preliminary adjudication into the merits of the case.

By contrast here, whether Clear Channel is liable for monopolization on the one hand, and whether issues common to the class are likely to predominate, on the other hand, are sufficiently distinct that the district court did not prematurely rule on the merits by weighing the experts' testimony. *See* 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1798, at 223 (3d ed.2005) (commenting that on a motion for class certification an evidentiary hearing may be appropriate if it is "directed toward examining the underlying facts to determine whether they are susceptible to common proof and is not to determine the probability of success on the merits").

The finding that individual issues were likely to predominate did not depend on an assessment of the validity of plaintiff's claim or of the potential claims of other members of the putative class. Rather, the district court resolved an independent fact question concerning the expected forms of proof in light of the specific factual allegations contained in the amended complaint. Some overlap with the ultimate review on the merits is an acceptable collateral consequence of the "rigorous analysis" that courts must perform when determining whether Rule 23's requirements have been met, *see Falcon*, 457 U.S. at 161, 102 S.Ct. 2364, so long as it does not stem from a forbidden preliminary inquiry into the merits, *Eisen*, 417 U.S. at 177, 94 S.Ct. 2140. *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir.2000) (*"Eisen*, fairly read, does not foreclose consideration of the probable course of the litigation at the class certification stage. Indeed, such a proscription would be inconsistent not only with the Court's subsequent opinion in [*Falcon* ], but also with the method of Rule 23"); 5 *Moore's Federal Practice*, § 23.84[2][a] (Matthew Bender 3d ed. 2005) (*"Eisen* should not be read to prevent any inquiry into the substantive issues at the certification stage."); *see also Amchem Prods.*, 521 U.S. at 623, 117 S.Ct. 2231 (explaining that the Rule 23(b)(3) "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy").

A number of our sister circuits have determined more broadly that an inquiry into the merits of a claim is appropriate to the extent necessary to determine whether the requirements of Rule 23 have been met. *See Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 312–13 (5th Cir.2005); *Blades*, 400 F.3d at 567, 575; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir.2004); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n. 15 (11th Cir.2003); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166–69 (3d Cir.2001); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir.2001); *see also* 5 *Moore's Federal Practice* § 23.45[4] ("The facts necessary to decide predominance are typically intertwined with the facts relating to the merits, so that some inquiry into the underlying factual issues is required at the certification stage."). In light of our conclusion in *Caridad*, we do not go that far; we understand *Caridad* to prohibit weighing evidence in connection with Rule 23 determinations to the extent those determinations are effectively identical to merits issues. In other words, "[t]he closer any [Rule 23 dispute] comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require." *Blades*, 400 F.3d at 567.

The comparison of the weight of the experts' testimony here did not amount to error inasmuch as the district court was resolving the sufficiently independent question of whether plaintiff had made a

proper showing of predominance pursuant to Rule 23(b)(3). *See id.* at 575 ("[W]e believe the district court's findings as to the experts' disputes were properly limited to whether, if the [plaintiff's] basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury."); *see also In re Visa Check,* 280 F.3d at 135 (invoking the *Caridad* rule, but affirming and favorably reviewing a district court's thorough predominance analysis that indirectly addressed merits issues).

██ Plaintiff also maintains the district court impermissibly considered the merits of her action in requiring her to show that common issues would predominate pursuant to Rule 23(b)(3) by a preponderance of the evidence. It was appropriate to require plaintiff to show compliance with the elements of Rule 23. *See Amchem Prods.,* 521 U.S. at 614, 117 S.Ct. 2231. It is not evident that the trial court mandated a Rule 23(b)(3) showing by a preponderance of the evidence. In making that argument plaintiff relies on the trial judge's comment that she had to demonstrate that she had satisfied Rule 23 "by some preponderance of evidence, I think, or some standard . . . that I should certify a class nationally."

██ Even if a preponderance of the evidence standard was invoked, that was not in error. Complying with Rule 23(b)(3)'s predominance requirement cannot be shown by less than a preponderance of the evidence. If plaintiff had a lesser burden, then a motion to certify a Rule 23(b)(3) class would be granted despite the motion judge's belief that it is more likely than not that individual issues would predominate. Under such circumstances, certification would contravene the express language of Rule 23(b)(3), which requires that a court find predominance. *See* Fed. R.Civ.P. 23(b)(3) 1966 advisory committee note ("The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members."). Further, the purpose of Rule 23(b)(3), to ensure that the class is "sufficiently cohesive to warrant adjudication by representation," *Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231, would be undermined if predominance could be shown by less than a preponderance of the evidence.

Because the predominance inquiry here is sufficiently independent of the merits to justify weighing the evidence, we do not think the district court erred in requiring Heerwagen to show predominance pursuant to Rule 23(b)(3) by a preponderance of the evidence.

## 2. Limiting Discovery

██ Discovery is often appropriate on class certification issues, *see Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 n. 13, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *Parker,* 331 F.3d at 21. The amount of discovery is generally left to the trial court's considerable discretion. *Am. Sav. Bank, FSB v. UBS PaineWebber, Inc. (In re Fitch, Inc.),* 330 F.3d 104, 108 (2d Cir. 2003); *see also Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004); 3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 7.8 (4th ed. 2005) ("Plaintiffs seeking discovery of the defendants on class issues should be aware that the management of discovery . . . is under the sound discretion of the court."); 5 *Moore's Federal Practice* § 23.85[1] ("District courts have considerable discretion to determine whether, and to what extent, to allow discovery with respect to class certification issues.").

Discovery on the prerequisites of Rule 23 is plainly appropriate, *Sirota,* 673 F.2d

at 571, and in some cases necessary, *see Chateau de Ville Prod., Inc. v. Tams–Witmark Music Library, Inc.,* 586 F.2d 962, 966–67 (2d Cir.1978) (remanding after district court granted class certification because it had not permitted adequate discovery on the class certification issues). We have remanded in the past where the district court made a determination on the class certification question without any discovery and prior to plaintiff's filing a class certification motion. *See Parker,* 331 F.3d at 21–22. Similarly, we have suggested plaintiffs should not gain any strategic benefit from failure to seek discovery on the class certification issue because they could have obtained such discovery, but chose not to. *See Abrams v. Interco Inc.,* 719 F.2d 23, 30 (2d Cir.1983).

 Limiting discovery in preparation for the class certification motion in order to reduce expense, the district court allowed plaintiff's deposition and the deposition of experts. Although Judge Sprizzo made comments suggesting improper bases for limiting discovery—including a categorical statement that he generally does not allow plaintiffs discovery on the issue of class certification and an unsupported claim that plaintiff's counsel here sought discovery "as some sort of settlement leverage"—we nonetheless cannot conclude that the decision to limit discovery here amounted to an abuse of the district court's broad discretion.

In addition to the discovery allowed, significant relevant information was apparently available in the public domain, as evidenced by the exhibits submitted in connection with plaintiff's motion for class certification. Moreover, plaintiff failed to make any showing, however preliminarily, that she could satisfy the predominance requirement of Rule 23(b)(3) or that she might be able to do so with additional discovery. *See Mantolete v. Bolger,* 767 F.2d 1416, 1424 (9th Cir.1985) ("Although in some cases a district court should allow discovery to aid the determination of whether a class action is maintainable, the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed.R.Civ.P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations.").

Plaintiff testified that during the class period she never traveled outside of Chicago, her own metropolitan area, for a concert, nor studied ticket prices for concerts outside her area, and would not have traveled to New York to see a Paul McCartney concert for $50 even though she had paid $120 to see such a show in Chicago. In addition, as already noted, the expert she proffered essentially conceded that there is an absence of elasticity of demand in the concert ticket market between different locations. The expert urged, however, that the market for concert tickets was a national one based on the unsound assumption that "[i]f prices are moving in comparable fashion across markets, across geographic locations, that presupposes they are in the same market." *See* Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law,* ¶ 5.04a, at 5–26 (3d ed. Supp.2005) ("Correlations in price movements can be spurious, as when prices in two areas respond not to each other but to a common change in the price of some input.").

Plaintiff has made no colorable showing that additional discovery would have enabled her to demonstrate predominance or that the district court abused its discretion in limiting discovery to conserve the resources of the parties. She has not identified any information about the relevant market that might have helped her overcome her inability to establish that the market for concert tickets is national.

## CONCLUSION

Despite the various problems we have with the district court's methods and approach to this case, we affirm its denial of class certification because whatever proof the plaintiff attempted to use to show defendant's alleged monopoly power or attempted monopolization, a national class would not be the appropriate or preferable means to deal with plaintiff's claim. Because appellant failed to meet the requirements of Fed.R.Civ.P. 23(b)(3) class certification was properly denied.

In sum, we hold that plaintiff has failed to demonstrate that the district court committed prejudicial error in: (1) determining that she must prove her monopolization claim with reference to a specific market; (2) concluding that the market at issue here is local; (3) weighing the testimony of the experts or imposing a preponderance of the evidence standard in connection with the Rule 23(b)(3) predominance question; or (4) limiting discovery on the motion for class certification.

Affirmed.